UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NAKIA REESE and STEPHANIE POOL, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| IPSWITCH, INC. and PROGRESS SOFTWARE CORPORATION, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Nakia Reese and Stephanie Pool, individually and on behalf of all others similarly situated (hereinafter "Plaintiffs"), bring this Class Action Complaint against Defendants Ipswitch, Inc. and Progress Software Corporation (collectively, "Defendants"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Plaintiffs bring this class action on behalf of themselves and all other individuals ("Class Members") who had their sensitive personal identifiable information—i.e., information that is or could be used, whether on its own or in combination with other information, to identify, locate, or contact a person, including, without limitation: names, email addresses, phone numbers, home addresses, dates of birth, Social Security numbers ("SSN"), drivers' license information, tax records, bank account and routing information, and other personally identifying information ("PII" or "Personal Information")—disclosed to unauthorized third parties during a massive data breach

compromising Defendants' MOVEit Transfer and MOVEit Cloud ("MOVEit") software that occurred on or about May 27, 2023 (the "Data Breach").

2.     MOVEit is an industry-leading third-party data transfer service used to send large files. It is widely used across the country and around the world. Reports are rapidly emerging of newly discovered exposures of sensitive data in this major international cyber-attack.

3.     During the Data Breach, and due to Defendants' data security and privacy shortcomings, unauthorized persons were able to gain access to Defendants' clients' files by exploiting a vulnerability in the MOVEit platform. Specifically, the attacks, which appear to be ongoing, reportedly have been conducted by a ransomware gang, which began hacks of MOVEit transfer servers on May 27, 2023, using a vulnerability tracked as CVE-2023-34362.

4.     The MOVEit attacks have resulted in widespread disclosures of data breaches domestically and worldwide, impacting various companies, federal government agencies, and local state agencies. Numerous impacted companies have announced being impacted by the MOVEit Data Breach, while others will continue to disclose breaches in the near term.

5.     Plaintiffs are victims of Defendants' conduct and the MOVEit Data Breach.

6.     On June 15, 2023, the Louisiana Office of Motor Vehicles ("OMV") issued a press release confirming that it is one of the still undetermined number of government entities, businesses, and other organizations impacted by the MOVEit Data Breach.[1] OMV confirmed that it believes all Louisianans with a state-issued driver's license, ID, or car registration likely had the following data exposed to the cyber attackers: name, address, Social Security number, birthdate, height, eye color, driver's license number, vehicle registration number, and handicap placard

---

[1] *Major Cyber Attack at OMV Vendor, Louisianans Should Act Urgently to Protect Their Identities*, LOUISIANA.GOV (June 15, 2023), https://gov.louisiana.gov/index.cfm/newsroom/detail/4158.

information. According to reports, about 6 million Louisiana OMV records were impacted by the breach.[2]

7.      Plaintiff Pool, a Texas citizen, had her Personal Information disclosed as a result of the Louisiana OMV episode of the MOVEit Data Breach. Plaintiff Pool and millions of other Class Members have had their data privacy, data security, and identities exposed to cybercriminals and their Personal Information jeopardized because of the Data Breach.

8.      On June 1, 2023, the Oregon Department of Transportation ("ODOT") learned that it was also one of the government entities, businesses, and other organizations impacted by the MOVEit Data Breach.[3] Similarly, ODOT confirmed that it believes all persons with an active Oregon driver's license, permit, or ID card should assume their data was exposed to the cyber attackers, including the following information: name, home and mailing address, license of ID number, and the last four digits of their Social Security number.[4]

9.      Plaintiff Reese, an Oregon citizen, had her Personal Information disclosed as a result of the ODOT episode of the MOVEit Data Breach. Plaintiff Reese and millions of other Class Members have had their data privacy, data security, and identities exposed to cybercriminals and their Personal Information jeopardized because of the Data Breach.

10.     Defendants are and at all relevant times were well aware of the data security shortcomings in their MOVEit file transfer software. Indeed, software vulnerabilities have become ubiquitous in large data breaches. Nevertheless, Defendants failed to take steps to undertake the

---

[2] *Id.*

[3] *MOVEit Data Breach*, Oregon.gov, https://www.oregon.gov/odot/dmv/pages/data _breach.aspx (last visited July 10, 2023).

[4] *Id.*

necessary testing for and eliminate the vulnerabilities in the MOVEit software, putting its file transfer service clients and their clients' customers, employees, and other affiliated persons at risk of being impacted by a breach.

11.    Defendants' failure to ensure that its MOVEit file transfer software and services were adequately secure fell far short of its obligations and Plaintiffs' and Class Members' reasonable expectations for data privacy, has jeopardized the security of their Personal Information, and has put them at a serious and continuing risk of fraud and identity theft.

12.    As a result of Defendants' conduct and the Data Breach, Plaintiffs' and Class Members' privacy has been invaded. Their Personal Information is now in the hands of criminals, and they face a substantially increased risk of identity theft and fraud. Accordingly, these individuals now must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

13.    Plaintiffs seek to remedy these harms, on behalf of themselves and all similarly situated individuals whose Personal Information was accessed and/or compromised during the Data Breach, and bring causes of action for: (I) Negligence; (II) Negligence Per Se; (III) Breach of Contract; (IV) Unjust Enrichment; (V) Invasion of Privacy; and (VI) Breach of Fiduciary Duty.

**THE PARTIES**

14.    Plaintiff Stephanie Pool is a citizen of Texas and former resident of Louisiana. Plaintiff Pool was a holder of a state-issued Louisiana driver's license and thus was a victim of the OMV episode of the MOVEit Data Breach. As a result of and following the Data Breach, Plaintiff Pool experienced fraudulent activity on her credit card when an unknown individual attempted to make an unauthorized purchased using her financial information. Plaintiff Pool has replaced her

credit cards and anticipates spending time monitoring her financial and other accounts and taking other actions to mitigate the consequences of the Data Breach.

15.    Plaintiff Reese is a citizen of Oregon. Plaintiff Reese is a holder of an Oregon driver's license and thus was a victim of the ODOT episode of the MOVEit Data Breach. As a result of and following the Data Breach, Plaintiff Reese experienced fraudulent activity on her financial accounts when an unknown individual attempted to open a bank account using her personal information. Plaintiff Reese anticipates spending time monitoring her financial and other accounts and taking other actions to mitigate the consequences of the Data Breach.

16.    Defendant Ipswitch, Inc. is a Massachusetts for profit corporation with a principal place of business located at 15 Wayside Road, 4th Floor, Burlington, Massachusetts 01803.

17.    Defendant Progress Software Corporation is a Delaware corporation with a principal place of business located at 15 Wayside Road, Suite 4, Burlington, Massachusetts 01803.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00) and is a class action in which Plaintiffs are citizens of states different from Defendants. Further, greater than two-thirds of the Class Members reside in states other than the state in which Defendants are citizens.

19.    The Court has personal jurisdiction over Defendants because Defendants have their principal office in Massachusetts; transact significant business in Massachusetts; and otherwise have sufficient minimum contacts with and intentionally avail themselves of the markets in

Massachusetts through their promotion, marketing, and sale of MOVEit software and other software, products, and related services.

20.    Venue properly lies in this judicial district because, inter alia, Defendants have their principal places of business, transact substantial business, have agents, and are otherwise located in this District; and a substantial part of the conduct giving rise to the claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A.  Ipswitch, Inc., Progress Software, and the Unsecure MOVEit Software

21.    Defendant Ipswitch, Inc. ("Ipswitch") is an IT software development company founded in 1991 in Burlington, Massachusetts. Ipswitch sells its software and related products and services, including MOVEit solutions, directly and through resellers and distributors in the United States.

22.    Ipswitch is now a part of Defendant Progress Software Corporation ("Progress"), a public domestic software company based in Massachusetts. Progress acquired Ipswitch in May 2019 for approximately $225 million.

23.    Ipswitch developed and, through Progress, sells MOVEit, which Defendants claim is "the leading secure Managed File Transfer (MFT) software used by thousands of organizations around the world to provide complete visibility and control over file transfer activities."[5]

24.    On their websites, Defendants make a host of claims about data security and their MOVEit product. Ipswitch claims, generally, that its "Enterprise File Transfer Solutions – Mak[e]

---

[5] *MOVEit*, IPSWITCH, https://www.ipswitch.com/moveit (last visited July 10, 2023).

the networked world a safer place."[6] Its website states: "Our efficient, easy-to-use products empower customers to respond faster to business demands through accelerated implementation and improved productivity and security."[7]

25.     Specific to MOVEit, Ipswitch claims that "MOVEit enables your organization to meet compliance standards, easily ensure the reliability of core business processes, and secure the transfer of sensitive data between partners, customers, users and systems."[8] Ipswitch claims its MOVEit Transfer and MOVEit Cloud products give customers "control" over their businesses; "provides full security, reliability and compliance"; provide "encryption, security, activity tracking tamper-evident logging, and centralized access controls to meet your operational requirements"; "[r]eliably and easily comply with SLAs, internal governance requirements and regulations like PCI, HIPAA, CCPA/CPRA and GDPR"; and provide "secure and managed file transfer."[9]

26.     Progress makes similar statements about data security. Its website claims "MOVEit provides secure collaboration and automated file transfers of sensitive data" and "[e]ncryption and activity tracking enable compliance with regulations such as PCI, HIPAA and GDPR."[10]

27.     Progress also touts all of the following on its website regarding MOVEit[11]:

_____

[6] *Enterprise File Transfer Solutions – Making the networked world a safer place*, IPSWITCH, https://www.ipswitch.com/ (last visited July 10, 2023).

[7] *Id.*
[8] *MOVEit*, *supra* note 5.

[9] *Id.*

[10] *MOVEit: Managed File Transfer Software*, Progress, https://www.progress.com/moveit (last visited July 10, 2023).

[11] *Id.*

## Securely Share Files Across the Enterprise and Globally

Reduce the risk of data loss and non-compliance with a fully-auditable and managed file transfer solution. Extend file transfer capabilities to all users to eliminate insecure use of email and quickly onboard partners and third-parties. Easily create automated file transfer tasks and workflows to accelerate your business and eliminate the risk of user error. Track and report on every single transfer.

**Transfer Sensitive Information Securely**

Encryption in-transit and at-rest and advanced security features keep sensitive information out of harm's way.

**Assure Regulatory Compliance**

Easily implement security controls and establish an audit trail.

**Let End Users Collaborate Securely**

Easily ensure secure and compliant sharing of sensitive data for all users.

**Accelerate Task and Workflow Creation**

Enable your team with programming-free automation of multi-step, logic-based workflows.

28.    As demonstrated above, Defendants heavily tout and promote the MOVEit products and services as capable of safely transferring sensitive information.

29.    Despite these assurances and claims, Defendants failed to offer safe and secure file transfer products and failed to adequately protect Plaintiffs' and Class Members' Personal Information involved in its clients' use of Defendants' MOVEit products.

30.    This is because the products that Defendants offered, and which their clients used, were not secure.

31.    Despite knowing or having reason to know that MOVEit leaves Defendants' customers and the third parties interacting and transacting with their file transfer customers (like Plaintiffs and other Class Members) exposed to security threats, they continued to offer and transact business with their customers using the MOVEit file transfer products without adequately testing and identifying the vulnerabilities in the products, and patching or otherwise eliminating those threats.

32.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Personal Information.

33.    Plaintiffs and Class Members directly or indirectly entrusted Defendants with their sensitive and confidential information, including Personal Information, some of which is static, meaning that it does not change and can be used to commit myriad financial crimes against Plaintiffs and Class Members.

34.    Plaintiffs and Class Members relied on Defendants to keep their Personal Information confidential and securely maintained, to use the information for business purposes only, and to make only authorized disclosures of this information.

35.    Defendants had a duty to adopt reasonable measures to protect and safeguard the Personal Information of Plaintiffs and Class Members from unauthorized disclosure to third parties.

36.    Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted Personal Information they were entrusted to maintain for Plaintiffs and Class Members, causing the exposure of the Personal Information.

37.    The unencrypted Personal Information of Plaintiffs and Class Members will likely end up for sale on the dark web, subjecting Plaintiffs and Class Members to the continued threat of identity theft and other fraudulent activity by unknown actors. Additionally, the Personal Information may fall into the hands of companies that will use the information for targeted marketing without the approval of Plaintiffs and Class Members.

**B.  The MOVEit Data Breach**

38.    On May 31, 2023, Progress and Ipswitch alerted their customers about a critical vulnerability in the MOVEit software referred to as CVE-2023-34362. Specifically, Defendants

identified that MOVEit's web-based front end is affected by a critical structured query language (SQL) injection vulnerability/attack vector that can be exploited by an unauthenticated attacker to access databases associated with the product.

39.     According to reports, the Clop (also known as CLOP or Cl0p) ransomware gang is responsible for the attack on the MOVEit platform, which has led to compromised networks around the globe, including across the United States.

40.     The Cybersecurity and Infrastructure Security Agency (CISA) and the FBI first warned on June 7, 2023, that the Clop ransomware gang was exploiting a vulnerability in MOVEit Transfer. "Internet-facing MOVEit Transfer web applications were infected with a specific malware used by CL0P, which was then used to steal data from underlying MOVEit Transfer databases," the advisory said, as it explained how threat actors carried out the attack.[12]

41.     A senior CISA officer informed reporters that "several hundred" businesses and organizations in the United States may be impacted by the hacking campaign in addition to government entities.[13]

42.     The list of impacted entities and organizations that are MOVEit customers continues to grow, but reports indicate that the following domestic entities have indicated potential impact or confirmed impact by the MOVEit breach, among others ("Impacted MOVEit Clients"):

- Louisiana Office of Motor Vehicles;
- Oregon Department of Motor Vehicles;
- Oak Ridge Associated Universities (U.S. Department of Energy);
- Waste Isolation Pilot Plant (U.S. Department of Energy);

---

[12] Bruce Sussman, *Clop Ransomware and the MOVEit Cyberattack: What to Know*, BLACKBERRY BLOG (June 19, 2023), https://blogs.blackberry.com/en/2023/06/clop-ransomware-and-moveit-cyberattack.

[13] Onur Demirkol, *US government under siege: MOVEit breach exposes critical data to ruthless Clop ransomware attack*, DATACONOMY (June 19, 2023), https://dataconomy.com/2023/06/19/moveit-breach-data-clop-ransomware/.

- Umpqua Bank;
- UnitedHealthcare Student Resources;
- Leggett & Platt;
- University System of Georgia;
- 1st Source;
- First National Bankers Bank;
- Putnam Investments
- Datasite;
- National Student Clearinghouse;
- Gen Digital.

43.    Defendants had obligations created by contract, industry standards, common law, federal and state law, and representations made to Plaintiffs and Class Members to use reasonable data security procedures and practices to keep Plaintiffs' and Class Members' Personal Information confidential and to protect it from unauthorized access and disclosure. They failed to comply with these obligations.

44.    Plaintiffs and Class Members provided, directly or indirectly, their Personal Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

45.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

46.    Defendants knew or should have known that their electronic records and systems would be targeted by cybercriminals.

**C. Impact of the Data Breach**

47.    As a result of the MOVEit Data Breach, Plaintiffs and many millions of individuals have had their sensitive Personal Information exposed as a result of Defendants' unsecure MOVEit file transfer product being exploited by cyber criminals during the Data Breach.

48.     The harm caused to Plaintiffs and Class Members by the Data Breach is already apparent. Criminal hacker groups have made ransomware payment demands upon Impacted MOVEit Clients and have already publicly disseminated information about the Data Breach[14] and, potentially, lists containing sensitive Personal Information, presumably for those MOVEit customers who decline to pay the ransom demand.

49.     Even if Impacted MOVEit Clients pay the ransom, there is no guarantee that the criminals making the ransom demands will suddenly act honorably and destroy the sensitive information. In fact, there is no motivation for them to do so, given the burgeoning market for sensitive Personal Information on the dark web.

50.     The breach creates a heightened security concern for Plaintiffs and Class Members because SSNs and other sensitive information was or may be among the data exposed during the Data Breach.

51.     Theft of SSNs creates a particularly alarming situation for victims because those numbers cannot easily be replaced. To obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

52.     Given the highly sensitive nature of SSNs, theft of SSNs in combination with other personally identifying information (e.g., name, address, date of birth) is akin to having a master

---

[14] Carly Page, *Ransomware gang lists first victims of MOVEit mass-hacks, including US banks and universities*, TECHCRUNCH (June 15, 2023), https://techcrunch.com/2023/06/15/moveit-clop-mass-hacks-banks-universities/.

key to the gates of fraudulent activity. Per the United States Attorney General, Social Security numbers "can be an identity thief's most valuable piece of consumer information."[15]

53.    Defendants had a duty to keep sensitive information confidential and to protect it from unauthorized disclosures. Plaintiffs and Class Members provided their Personal Information to the Louisiana OMV, ODOT, and other impacted MOVEit clients with the common sense understanding any business partners to which these entities disclosed Personal Information (i.e., Defendants) would comply with their obligations to keep such information confidential and secure from unauthorized disclosures.

54.    Defendants' data security obligations were particularly important given the substantial increase in data breaches—particularly those involving SSNs—in recent years, which are widely known to the public and to anyone in Defendants' industry of data collection and transfer.

55.    Data breaches are by no means new, and they should not be unexpected. These types of attacks should be anticipated by companies that collect and store sensitive and personally identifying information, and these companies must ensure that data privacy and security is adequate to protect against and prevent known attacks. Defendants cannot feign ignorance. Their representations about MOVEit acknowledge the need for and importance of "compliance with regulations such as PCI, HIPAA and GDPR" in collecting, storing, and transferring sensitive data.[16]

---

[15] *Fact Sheet: the Work of the President's Identity Theft Task Force*, Dep't of Justice (Sept. 19, 2006), https://www.justice.gov/archive/opa/pr/2006/September/06_ag_636.html.

[16] John Iwuozor, *7 Ways to Keep Your Business Files Safe and Protect Your Data*, IPSWITCH (Apr. 24, 2023), https://www.ipswitch.com/blog/7-ways-keep-your-business-files-safe-protect-your-data.

56.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[17]

57.     Defendants could have prevented this Data Breach by properly securing and encrypting the systems containing the Personal Information of Plaintiffs and Class Members.

58.     The occurrence of the Data Breach indicates that Defendants failed to adequately implement reasonable measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the Personal Information of Plaintiffs and Class Members.

59.     Defendants' negligence in safeguarding the Personal Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendants to protect and secure sensitive data they possess.

60.     Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Personal Information of Plaintiffs and Class Members from being compromised.

61.     The Federal Trade Commission ("FTC") defines "identity theft" as "a fraud committed or attempted using the identifying information of another person without authority."[18] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's

---

[17] Fed. Bureau of Investigation, *How to Protect Your Networks from Ransomware* 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited May 11, 2023).

[18] 17 C.F.R. § 248.201(b)(9).

license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[19]

62.    The ramifications of Defendants' failure to keep secure the Personal Information of Plaintiffs and Class Members are long lasting and severe. Once Personal Information is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

63.    Identity theft victims are frequently required to spend many hours and large amounts of money repairing the impact to their credit. Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, tax fraud, phone or utilities fraud, and bank/finance fraud.

64.    There may be a time lag between when sensitive Personal Information is stolen and when it is used. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[20]

65.    With access to an individual's sensitive Personal Information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: opening utility accounts using the victim's identity; file a fraudulent tax return using the victim's information; or even give the victim's personal information to police during an arrest.[21]

---

[19] *Id.* § 248.201(b)(8).

[20] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019), *available at* https://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

[21] *See* Fed. Trade Comm'n, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last visited July 10, 2023).

### D. Defendants Failed to Comply with FTC Guidelines

66.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.[22]

67.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[23] The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

68.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for

---

[22] *See, e.g.*, *Fed. Trade Comm'n v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

[23] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

69.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

70.    As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Personal Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

71.    Defendants were at all times fully aware of their obligation to protect the Personal Information of their customers yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**E.  Defendants Failed to Comply with Industry Standards**

72.    Experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Personal Information which they collect and maintain.

73.    Some general industry best practices that should be implemented by businesses like Defendants include but are not limited to: educating all employees, using only strong password requirements, implementing multilayer security including firewalls, anti-virus and anti-malware software, using encryption, requiring multi-factor authentication, backing up data, and limiting

which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry best practices.

74.    Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

75.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1[24] (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls[25] (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

76.    Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**F. Defendants Breached their Duties to Safeguard Plaintiffs' and Class Members' Personal Information**

77.    In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing,

---

[24] Nat'l Inst. of Standards & Tech., *Framework for Improving Critical Infrastructure Cybersecurity* (2018), *available at* https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04 162018.pdf.

[25] *See The 18 CIS Critical Security Controls*, CTR. FOR INTERNET SEC., https://www.cisecurity.org/controls/cis-controls-list (last visited May 11, 2023).

safeguarding, deleting, and protecting the Personal Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including complying with industry standards and requirements, training for its staff, and ensuring that its computer systems, networks, and protocols adequately protected the Personal Information of Class Members.

78.    Defendants breached their obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.   Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b.   Failing to adequately protect customers' Personal Information;

    c.   Failing to properly monitor their own data security systems for existing intrusions;

    d.   Failing to sufficiently train their employees regarding the proper handling of its customers' files containing the Personal Information;

    e.   Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

    f.   Failing to adhere to industry standards for cybersecurity as discussed above; and

    g.   Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' Personal Information.

79.    Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Personal Information by allowing cyberthieves to access their computer network, systems, and servers which contained unsecured and unencrypted Personal Information.

80.     Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Personal Information.

81.     Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendants.

**G.  Defendants Knew of Should Have Known of the Risk to Clients' and Individuals' Personal Information**

82.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting entities that collect and store PII and other sensitive information, like Defendants, preceding the date of the Data Breach.

83.     In light of recent high profile data breaches at other industry leading companies, including Microsoft (250 million records, December 2019). Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the Personal Information that they collect and maintain would be targeted by cybercriminals.

84.     Data thieves regularly target companies like Defendants due to the highly sensitive information that they record and maintain. Defendants knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

85.    Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[26]

86.    In 2021, a record of 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[27] The trend continued through 2022, as 1,802 data breaches occurred, resulting in approximately 422,143,312 sensitive records being exposed.[28]

87.    Despite the prevalence of public announcements of data breaches and data security compromises, Defendants failed to take appropriate steps to protect the Personal Information of Plaintiffs and Class Members from being compromised.

88.    At all relevant times, Defendants, as a custodian of PII, knew or reasonably should have known of the importance of safeguarding the Personal Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

---

[26] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[27] *See* Identity Theft Res. Ctr., *2021 Annual Data Breach Report* (2021), *available at* https://www.idtheftcenter.org/publication/2021-annual-data-breach-report-2/.

[28] *See* Identity Theft Res. Ctr., *2022 Data Breach Report* (2022), *available at* https://www.idtheftcenter.org/publication/2022-data-breach-report/.

89.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' systems, amounting to potentially millions of individuals' detailed Personal Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

90.     Despite the known risk of data breaches and the widespread publicity and industry alerts regarding other notable (similar) data breaches, Defendants failed to take reasonable steps to adequately protect MOVEit, which it should have known was unsecure, from being breached, leaving its clients (including the Impacted MOVEit Clients) and all persons who provide sensitive Personal Information to those clients (i.e., Plaintiffs and the Class Members) exposed to risk of fraud and identity theft.

91.     Defendants are, and at all relevant times have been, aware that the sensitive Personal Information they handle and store in connection with providing their file transfer services is highly sensitive. As companies that provide file transfer services involving highly sensitive information, Defendants are aware of the importance of safeguarding that information and protecting their systems and products from security vulnerabilities, and Defendants repeatedly acknowledge the importance of data security and compliance with data privacy requirements and regulations on their websites for MOVEit.

92.     Defendants were aware, or should have been aware, of regulatory and industry guidance regarding data security, and were alerted to the risks associated with failing to ensure that their file transfer product MOVEit was adequately secured.

93.     Despite the well-known risks of hackers, cybercriminals, data breaches, and cybersecurity intrusions, Defendants failed to employ adequate data security measures in

connection with offering its MOVEit file sharing software products and related services in a meaningful way in order prevent breaches, including the Data Breach.

94.     The security flaws inherent to MOVEit run afoul of industry best practices and standards. Had Defendants adequately tested MOVEit for security flaws and vulnerabilities, and undertaken industry best practices and steps to protect and secure MOVEit, they could have prevented the Data Breach.

95.     Despite the fact that Defendants were on notice of the very real possibility of data theft and data breaches associated with the MOVEit products, they failed to make necessary changes to the product or to stop offering it while working these issues out and permitted a massive intrusion to occur that resulted in disclosure of Plaintiffs' and Class Members' Personal Information to criminals.

96.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Personal Information of Plaintiffs and Class Members.

## H. The Value of Personal Information – Data Breaches Lead to Identity Theft and Cognizable Injuries

97.     The PII of consumers, such as Plaintiffs and Class Members, is valuable and has been commoditized in recent years.

98.     It is well known among companies that store sensitive PII that such information— such as the Social Security numbers and financial information stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, Business Insider noted that

"[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[29]

99.    Sensitive Personal Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years. As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen SSNs and other sensitive Personal Information directly on various illegal websites making the information publicly available, often for a price.

100.    PII is a valuable property right.[30] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[31] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[32] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

---

[29] Dennis Green et al., *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[30] *See* Marc van Lieshout, *The Value of Personal Data*, 457 INT'L FED'N FOR INFO. PROCESSING 26, 29 (2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . ."), *available at* https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[31] Org. for Econ. Cooperation & Dev., *Exploring the Economics of Personal Data: A Survey or Methodologies for Measuring Monetary Value* 4 (2013), *available at* https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[32] Interactive Advertising Bureau, *U.S. Firms to Spend Nearly 19.2 Billion on Third-Party Audience Data & Data-Use Solution in 2018, Up 17.5% From 2017*, IAB (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

101.     As a result of the real and significant value of this data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

102.     Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "[w]hen [privacy policy] information is made available, consumers tend to purchase from online retailers who better protect their privacy."[33]

103.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has deprived that consumer of the full monetary value of the consumer's transaction with the company.

104.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[34] Experian reports that a stolen credit or debit card number can

---

[33] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, 22(2) INFO. SYSTEMS RES. 254, 254 (2011), *available at* https://www.jstor.org/stable/23015560?seq=1.

[34] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

sell for \$5 to \$110 on the dark web.[35] Criminals can also purchase access to entire company data breaches from \$900 to \$4,500.[36]

105.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[37]

106.    What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[35] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[36] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited May 15, 2023).

[37] Soc. Sec. Admin., Pub. No. 05-10064, *Identity Theft and Your Social Security Number* 1 (2021), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf.

107.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[38]

108.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[39]

109.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police. The fraudulent activity resulting from the Data Breach may not come to light for years.

110.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Personal Information of Plaintiffs and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

111.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will

---

[38] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[39] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORKWORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

continue to incur such damages, in addition to suffering any fraudulent use of their Personal Information.

112.    As a direct and proximate result of Defendants' failures to prevent—and to timely detect—the Data Breach, Plaintiffs and the Class Members have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a.    The loss of the opportunity to control how their Personal Information is used;

b.    The diminution in value of their Personal Information;

c.    The compromise and continuing publication of their Personal Information;

d.    Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.    Unauthorized use of stolen Personal Information; and

g.    The continued risk to their Personal Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Personal Information in their possession.

113.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and Class

Members will need to remain vigilant against unauthorized data use for years or even decades to come.

114.    According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[40] As such, the FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

115.    Defendants allowed Plaintiffs' and Class Members' Personal Information to be compromised and disclosed to criminals by failing to take reasonable steps against an obvious threat.

116.    Industry experts are clear that a data breach is indicative of data security failures. Indeed, industry-leading research and advisory firm Aite Group has commented that "[i]f your data was stolen through a data breach that means you were somewhere out of compliance . . . ."[41]

117.    As a result of the events detailed herein, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Personal Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their

---

[40] Fed. Trade Comm'n, NCJ No. 238946, *Taking Charge: What to Do if Your Identity Is Stolen* 3 (2012), *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen.

[41] Lisa Baertlein, *Chipotle says hackers hit most restaurants in data breach*, REUTERS (May 26, 2017), https://www.reuters.com/article/us-chipotle-cyber-idUSKBN18M2BY.

Personal Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Personal Information compromised as a result of the Data Breach; (vii) loss of value of the Personal Information that was compromised in the Data Breach; (viii) overpayment for the services that were received without adequate data security; and (ix) loss of privacy.

118.    Victims of the Data Breach have likely already experienced harms, which is made clear by news of attempts to exploit this information for money by the hackers responsible for the breach, i.e., through ransom demands and as evidenced by news that Impacted MOVEit Client information is being posted on Clop's website.

119.    As a result of the Data Breach, Plaintiffs' and Class Members' privacy has been invaded, their Personal Information is now in the hands of criminals, they have experienced fraud and/or face a substantially increased risk of identity theft and fraud, and they must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

**I.    Plaintiffs' Experiences**

*i.    Plaintiff Stephanie Pool's Experience*

120.    Plaintiff Stephanie Pool was a holder of a state-issued Louisiana driver's license and thus was a victim of the OMV episode of the MOVEit Data Breach.

121.    In or around June of 2023, Plaintiff received notice of the Data Breach from the Louisiana OMV, alerting her of the Data Breach and that her Personal Information was at risk. Defendants have failed to send direct notice of the Data Breach to individuals affected by the Data Breach.

122.    Plaintiff is very careful about sharing her sensitive Personal Information. Plaintiff has never knowingly transmitted unencrypted sensitive Personal Information over the internet or any other unsecured source.

123.    Plaintiff stores any documents containing her sensitive Personal Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts in an effort to safeguard and protect her Personal Information.

124.    As a result of the Data Breach, Plaintiff heeded the Louisiana Office of Motor Vehicles' warning and spent time trying to mitigate the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred, and remedying the financial fraud she experienced when an unknown individual attempted to make an unauthorized purchase on her credit card. This time has been lost forever and cannot be recaptured.

125.    Even with the best response, the harm caused to Plaintiff cannot be undone.

126.    Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Personal Information—a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and as a result of the Data Breach.

127.    Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

128.    Plaintiff has suffered actual, imminent, and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her Personal Information being placed in the hands of unauthorized cybercriminals.

129.    Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

130.    Plaintiff has a continuing interest in ensuring that her Personal Information, which, upon information and belief, remains in Defendants' control, is protected, and safeguarded from future breaches.

ii.    *Plaintiff Nakia Reese's Experience*

131.    Plaintiff Nakia Reese is a holder of a state-issued Oregon driver's license and thus was a victim of the ODOT episode of the MOVEit Data Breach.

132.    In or around June of 2023, Plaintiff received notice of the Data Breach from ODOT, alerting her of the Data Breach and that her Personal Information was at risk. Defendants have failed to send direct notice of the Data Breach to individuals affected by the Data Breach.

133.    Plaintiff is very careful about sharing her sensitive Personal Information. Plaintiff has never knowingly transmitted unencrypted sensitive Personal Information over the internet or any other unsecured source.

134.    Plaintiff stores any documents containing her sensitive Personal Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts in an effort to safeguard and protect her Personal Information.

135.    As a result of the Data Breach, Plaintiff heeded the Oregon Department of Transportation's warning and spent time trying to mitigate the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred, and remedying the

financial fraud she has experienced when an unknown individual attempted to open a bank account using her personal information. This time has been lost forever and cannot be recaptured.

136.    Even with the best response, the harm caused to Plaintiff cannot be undone.

137.    Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Personal Information—a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and as a result of the Data Breach.

138.    Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

139.    Plaintiff has suffered actual, imminent, and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her Personal Information being placed in the hands of unauthorized cybercriminals.

140.    Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

141.    Plaintiff has a continuing interest in ensuring that her Personal Information, which, upon information and belief, remains in Defendants' control, is protected, and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

142.    Plaintiffs bring this action on behalf of themselves and the following Class:

All natural persons who are residents of the United States whose Personal Information was compromised in the MOVEit Data Breach, including all natural persons who were sent a notice indicating that their Personal Information may have been compromised in the MOVEit Data Breach (the "Nationwide Class").

143.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers, directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded

from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, was well as their immediate family members.

144.    Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

145.    **Numerosity:** The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, there are hundreds or thousands of individuals whose Personal Information may have been improperly accessed in the Data Breach, and each Class Member is apparently identifiable within Defendants' records.

146.    **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include, without limitation:

    a.   Whether and to what extent Defendants had a duty to protect Plaintiffs' and Class Members' Personal Information;

    b.   Whether Defendants had duties not to disclose the Plaintiffs' and Class Members' Personal Information to unauthorized third parties;

    c.   Whether Defendants had duties not to use Plaintiffs' and Class Members' Personal Information for unauthorized purposes;

    d.   Whether Defendants failed to adequately safeguard Plaintiffs' and Class Members' Personal Information;

    e.   Whether and when Defendants actually learned of the Data Breach;

f.  Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Personal Information had been compromised;

g.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.  Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Personal Information had been compromised;

i.  Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Defendants engaged in unfair, unlawful, or deceptive practices by misrepresenting that they would safeguard Plaintiffs' and Class Members' Personal Information;

k.  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

l.  Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

m.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

147.  **Typicality:** Plaintiffs' claims are typical of those of other Class Members because all had their Personal Information compromised as a result of the Data Breach, due to Defendants' misfeasance.

148.  **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be

antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class, and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

149. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

150. **Predominance:** Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same system and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

151. **Superiority and Manageability:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and

expense that hundreds of individual actions would require. Class action treatment will permit the adjudication or relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

152.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonable consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

153.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

154.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

155.    Unless a Class-wide injunction is issued, Defendants may continue in their unlawful disclosure and failure to properly secure the Personal Information of Class Members,

Defendants may continue to refuse to provide proper notification to Class Members regarding the Disclosure, and Defendants may continue to act unlawfully as set forth in this Complaint.

156.    Furthermore, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

157.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendants owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Personal Information;

b.    Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Personal Information;

c.    Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d.    Whether an implied contract existed between Defendants on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e.    Whether Defendants breached the implied contract;

f.    Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Personal Information had been compromised;

g.    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.  Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' Personal Information; and

i.  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

**CAUSES OF ACTION**

**COUNT I**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

158.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

159.  Plaintiffs and members of the Class entrusted their Personal Information to Defendants. Defendants owed to Plaintiffs and the Class a duty to exercise reasonable care in handling and using the Personal Information in their care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

160.  Defendants owed a duty of care to Plaintiffs and members of the Class because it was foreseeable that Defendants' failure to adequately safeguard their Personal Information in accordance with industry standards concerning data security would result in the compromise of that Personal Information—just like the Data Breach that ultimately came to pass. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and the Class's Personal Information by disclosing and providing access to this information to unauthorized third parties and by failing to properly supervise both the way the Personal

Information was stored, used, and exchanged, and those in their employ who were responsible for making that happen.

161.    Defendants owed to Plaintiffs and members of the Class a duty to notify them within a reasonable timeframe of any breach to the security of their Personal Information. Defendants also owed a duty to timely and accurately disclose to Plaintiffs and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiffs and the Class to take appropriate measures to protect their Personal Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

162.    Defendants owed these duties to Plaintiffs and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security protocols. Defendants actively sought and obtained Plaintiffs' and the Class's Personal Information.

163.    The risk that unauthorized persons would attempt to gain access to the Personal Information and misuse it was foreseeable. Given that Defendants hold vast amounts of Personal Information, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the Personal Information—whether by malware or otherwise.

164.    Personal Information is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Personal Information of Plaintiffs and the Class and the importance of exercising reasonable care in handling it.

165.    Defendants breached their duties by failing to exercise reasonable care in supervising their employees, agents, contractors, vendors, and suppliers, and in handling and

securing the Personal Information of Plaintiffs and the Class which actually and proximately caused the Data Breach and Plaintiffs' and the Class's injury. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and members of the Class's injuries-in-fact. As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiffs and the Class have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

166.    Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiffs and members of the Class actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Personal Information by criminals, improper disclosure of their Personal Information, lost benefit of their bargain, lost value of their Personal Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which Plaintiffs and Class Members continue to face.

167.    In failing to secure Plaintiffs' and Class Members' Personal Information, Defendants are guilty of oppression, fraud, or malice. Defendants acted or failed to act with a reckless, willful, or conscious disregard of Plaintiffs' and Class Members' rights. Plaintiffs, in addition to seeking actual damages, also seek punitive damages on behalf of themselves and the Class.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiffs and the Class)

168.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

169.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and the Class's PII.

170.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect customers or, in this case, consumers' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs' and the members of the Class's PII.

171.    Defendants breached their duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

172.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII.

173.    Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and the Class's PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

174.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

175.    But for Defendants' wrongful and negligent breach of the duties owed to Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have been injured.

176.    The injury and harm suffered by Plaintiffs and members of the Class were the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties and that their breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

177.    Had Plaintiffs and the Class known that Defendants did not adequately protect their PII, Plaintiffs and members of the Class would not have entrusted Defendants with their PII.

178.    Defendants' various violations and their failure to comply with applicable laws and regulations constitutes negligence *per se*.

179.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of PII; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

180.    Additionally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so

long as Defendants fail to undertake appropriate and adequate measures to protect their PII in their continued possession.

### COUNT III
**Breach of Contract**
**(On Behalf of Plaintiffs and the Class)**

181.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

182.    Defendants entered into various contracts with their clients, including the Louisiana Office of Motor Vehicles and Oregon Department of Transportation, to provide software services to their clients.

183.    These contracts are virtually identical to each other and were made expressly for the benefit of Plaintiffs and the Class, as it was their confidential PII that Defendants agreed to collect and protect through their services. Thus, the benefit of collection and protection of the PII belonging to Plaintiffs and the Class were the direct and primary objective of the contracting parties.

184.    Defendants knew that if they were to breach these contracts with their clients, the clients' consumers, including Plaintiffs and the Class, would be harmed by, among other things, fraudulent misuse of their PII.

185.    Defendants breached their contracts with their clients when they failed to use reasonable data security measures that could have prevented the Data Breach and resulting compromise of Plaintiffs' and Class Members' PII.

186.    As a reasonably foreseeable result of the breach, Plaintiffs and the Class were harmed by Defendants' failure to use reasonable data security measures to store their PII, including but not limited to, the actual harm through the loss of their PII to cybercriminals.

187.    Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, along with their costs and attorney fees incurred in this action.

### COUNT IV
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

188.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

189.    Plaintiffs and Class members conferred a benefit upon Defendants.

190.    Defendants appreciated or had knowledge of the benefits they received from Plaintiffs and Class members. Defendants benefited from receiving Plaintiffs' and Class members' PII, as this was used to provide file transferring software services.

191.    Plaintiffs and Class members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

192.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class members' PII.

193.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class members by utilizing cheaper, ineffective security measures. Plaintiffs and Class members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

194.    Defendants have retained the benefits of their unlawful conduct, including the amounts of payment received from Plaintiffs and Class Members that should have been used for adequate cybersecurity practices that they failed to provide.

195.    Defendants were supposed to use some of the monetary benefit provided to them by Plaintiffs and Class Members to secure the PII belonging to Plaintiffs and Class Members by paying for costs of adequate data management and security.

196.    Defendants should not be permitted to retain any monetary benefit belonging to Plaintiffs and Class Members because Defendants failed to implement necessary security measures to protect the PII of Plaintiffs and Class Members.

197.    Defendants gained access to Plaintiffs' and Class Members' PII through inequitable means because Defendants failed to disclose that they used inadequate security measures.

198.    Plaintiffs and Class Members were unaware of the inadequate security measures and would not have entrusted their PII to Defendants had they known of the inadequate security measures.

199.    Plaintiffs and Class members have no adequate remedy at law.

200.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and members of the Class all unlawful or inequitable proceeds received by them because of their misconduct and Data Breach.

## <u>COUNT V</u>
### Invasion of Privacy
### (On Behalf of Plaintiffs and the Class)

201.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

202.    Plaintiffs and Class Members maintain a privacy interest in their Personal Information, which is private, confidential information that is also protected from disclosure by applicable laws set forth above.

203.    Plaintiffs' and Class Members' Personal Information was contained, stored, and managed electronically in Defendants' records, computers, and databases and was intended to be secured from unauthorized access to third-parties because highly sensitive, confidential matters regarding Plaintiffs' and Class Members' identities were only shared with Defendants for the limited purpose of obtaining and paying for Defendants' services.

204.    Additionally, Plaintiffs' and Class Members' Personal Information is highly attractive to criminals who can nefariously use such Personal Information for fraud, identity theft, and other crimes without the victims' knowledge or consent.

205.    Plaintiffs and Class Members communicated sensitive Personal Information that they understood Defendants would keep private.

206.    Plaintiffs and Class Members have a reasonable expectation that Defendants would safeguard the confidentiality of their Personal Information and not disclose their Personal Information to third parties without Plaintiffs' or Class Members' authorization, consent, or knowledge.

207.    Plaintiffs and Class Members had a reasonable expectation of privacy given Defendants' representations and the FTCA. Moreover, Plaintiffs and Class Members have a general expectation that their Personal Information provided to a secure file transfer software service provider would be kept confidential.

208.    Defendants owed a duty to Plaintiffs and Class Members to keep their Personal Information confidential. Defendants failed to protect and, instead, released to unknown and unauthorized third parties the non-redacted and non-encrypted Personal Information of Plaintiffs and Class Members.

209.    Defendants' actions gave publicity to the Personal Information of Plaintiffs and Class Members.

210.    Defendants' failure to protect and maintain the confidentiality of Plaintiffs' and Class Members' Personal Information and resulting disclosure of this Personal Information to unauthorized third parties is highly offensive to the reasonable person. Defendants' disclosure of Plaintiffs' and Class Members' Personal Information to unauthorized third parties permitted the physical and electronic intrusion into private quarters where Plaintiffs' and Class Members' Personal Information was stored.

211.    Plaintiffs and Class Members did not authorize, consent, know about, or take any action to indicate consent to Defendants' conduct alleged herein.

212.    There is no legitimate public concern with respect to the Personal Information of Plaintiffs and Class Members.

213.    The intrusion was into a place or thing which was private and is entitled to be private. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

214.    Defendants acted with a knowing state of mind when they permitted the Data Breach to occur because they had actual knowledge that their information security practices were inadequate and insufficient.

215.    As a result of Defendants' public disclosure of Plaintiffs' and Class Members' Personal Information, Plaintiffs and Class Members have been needlessly harmed by having their Personal Information disseminated for profit by unknown and unauthorized actors on the dark web.

216.    Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

217.    Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, restitution, injunctive relief, reasonable attorneys' fees and costs, and any other relief that is just and proper.

218.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

**COUNT VI**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

219.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

220.    In light of the special relationship between Defendants and Plaintiffs and Class Members, whereby Defendants became guardian of Plaintiffs' and Class Members' PII, Defendants became a fiduciary by their undertaking and guardianship of the PII, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' PII; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and do store.

221.    Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with their clients, in particular, to keep secure their PII.

222.    Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period of time.

223.    Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' PII.

224.    Defendants breached their fiduciary duties owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

225.    Defendants breached their fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' PII.

226.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued

possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Defendants' services they received.

227.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Personal Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C. For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

E. Ordering Defendants to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages under applicable law;

H. For an award of attorneys' fees and costs under the common fund doctrine, and any other applicable law;

I. Costs and any other expense, including expert witness fees incurred by Plaintiffs in connection with this action;

J. Pre- and post-judgment interest on any amounts awarded; and,

K. Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 17, 2023

                    Respectfully Submitted,

                     */s/ Raymond Dinsmore*
                    Raymond Dinsmore, Esq.
                    Hayber, McKenna & Dinsmore, LLC
                    One Monarch Place, Suite 1340
                    Springfield, MA  01144
                    Tel: (413) 785-1400
                    rdinsmore@hayberlawfirm.com
                    BBO# 667340

                    Christopher D. Jennings*
                    Tyler B. Ewigleben*
                    Laura Edmondson*
                    **THE JOHNSON FIRM**
                    610 President Clinton Ave., Suite 300
                    Little Rock, AR 72201
                    Tel: (501) 372-1300
                    chris@yourattorney.com
                    tyler@yourattorney.com
                    ledmondson@yourattorney.com

                    *To be admitted *pro hac vice*

                    *Counsel for Plaintiffs and the Proposed Class*